**MODIFY and AFFIRM; and Opinion Filed August 5, 2019.**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00262-CR

**JACOB NATHAN ROSS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1611734-V**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Osborne

Appellant, Jacob Nathan Ross, was convicted of murder and sentenced to forty-five years' imprisonment. Appellant raises five issues on appeal: whether the evidence is sufficient to show intent, knowledge, or recklessness, whether the trial court's jury charge authorized a non-unanimous verdict on sudden passion, whether the evidence is legally and/or factually sufficient to support the jury's negative finding on the sudden passion special issue, and whether the trial court's jury charge erroneously informed the jury about parole and good conduct time. In a single cross-point, the State argues that the judgment should be reformed to add a deadly weapon finding. We modify the judgment to add a deadly weapon finding and affirm as modified.

## Background

In the early morning hours of January 21, 2016, Michael Gyger was found shot to death in a nice, new apartment in Carrollton, Texas. Gyger's body was seated on the loveseat of his leather living room set; he was holding a bottle of alcohol in his lap, the television remote control was at his side, and a piece of his skull was on the floor behind the loveseat. There was "blowback" of blood and skull fragments as far as the kitchen area of the apartment. Gyger's hands were crossed, one over the other, and he looked "relaxed." There was no physical evidence of any struggle in the apartment. The cause of Gyger's death was determined to be a gunshot wound to the back of his head and the manner of his death was a homicide.

Appellant, who was Gyger's occasional lover and who had been staying in the apartment, shot Gyger with a pistol belonging to Gyger's roommate, Tony Seghetti. Appellant then returned the gun to its proper place, gathered his belongings and his dog, and fled the apartment in Gyger's Cadillac, intending to drive to Chicago.

On his way out of town, appellant stopped in Argyle, Texas to see Natalee Clontz, his ex-fiancée. Natalee, who had broken off her engagement with appellant some weeks earlier in December of 2015, lived with Kyle Clontz,[1] her ex-husband, Zachary Dakota Owens, and Zack Culver. Appellant seemed "frantic" and was calling for Natalee's help. Appellant said he had shot Gyger and taken his car. Kyle called the police. When appellant saw Kyle making this call, he drove off with "spinning tires," leaving a burn mark on the driveway.

Armed with descriptions of both appellant and Gyger's Cadillac, George Mundo, a Denton County Deputy Sheriff, was en route to Argyle when he saw the Cadillac pass his patrol car at a

---

[1] The Clontzs will be referred to by their first names, Kyle and Natalee, to avoid any confusion.

high rate of speed. Mundo gave chase and radioed ahead to the city of Justin to request assistance in stopping the vehicle. Appellant stopped the Cadillac on his own after Justin officers got behind him.

Appellant was handcuffed and searched for weapons. Bags were put over his hands to preserve evidence and he was placed in a squad car. However, officers had missed a Zippo lighter in appellant's pocket during the search; appellant managed to get to it and set fire to the bags on his hands. Officers pulled appellant out of the vehicle, put out the fire, and had him checked over by "EMS to make sure he was okay." Mundo then re-bagged appellant's hands. Mundo recalled that during the course of their interaction appellant said he shot and killed a man in Carrollton who was trying to rape him.

Appellant was taken to the Carrollton police station where he was interviewed at length. Upon the detectives first entry into the room, appellant immediately told them he had shot Gyger.

Appellant explained to the detectives that Natalee had broken off their engagement, partially because appellant and Gyger were sexually involved. Since then, Gyger had been allowing appellant to stay with him because he didn't want appellant and his dog sleeping in the streets while it was cold outside. Gyger gave appellant $100 a week because appellant needed money; there were no "strings" attached to the money Gyger gave appellant as Gyger was just helping him out.

Appellant explained that Gyger hated women because he thought "they've all done him wrong." On the night of the shooting, appellant became upset when Gyger "kept saying shit" about Natalee and called her a "whore." Appellant did not share Gyger's hatred of women and was sad about the breakup with Natalee, for which he blamed Gyger.

Over the course of the interview, appellant's story branched into various and sometimes confusing possible reasons for why he had pulled the trigger.

–3–

Appellant initially said that Gyger had been trying to rape him and described Gyger propositioning him for oral sex and pulling his pants down. Appellant said he pulled his pants back up, pushed Gyger, and ran into Seghetti's bedroom with Gyger following behind. Yet when he was asked if there was a struggle, appellant said no.

Appellant told detectives that he had "a bunch of bottled up anger" because of what had been going on between he and Gyger. According to a Facebook message from Natalee, appellant would get drunk and fellate Gyger, and had occasionally "give[n] him anal" sex in exchange for money. In the past, appellant had woken up to Gyger fellating him. Appellant had masturbated for Gyger "a lot," and Gyger would lick appellant's ejaculate off his hand afterward. Additionally, Gyger had paid Natalee for sexual contact after appellant introduced them.

The night of the shooting, appellant and Gyger had a conversation about appellant not needing Gyger's money, but Gyger would "not stop trying to do stuff." As appellant told the detectives, "it was just fucking weird," and he "just couldn't take it no more."

At certain times during the interview, appellant said that Gyger had fellated him immediately before the murder. But in another version of the story, Gyger had asked appellant to shoot him after appellant spurned his advances and refused to have any sort of sexual relations. In this version, appellant put the gun to Gyger's head and Gyger depressed appellant's finger while it was on the trigger, causing the gun to fire. In a similar re-telling in which he claimed he lacked the intent to pull the trigger, appellant said that he was holding the gun against Gyger's head, and Gyger reached up to bat the gun away, but it went off.

In still another version of his story to the detectives, the only sexual contact between appellant and Gyger that day had occurred hours earlier, with appellant ejaculating into his hand and allowing Gyger to lick the ejaculate off his hand as usual. After that, appellant got into an argument with Gyger and packed his bags. Appellant threatened to leave the apartment after Gyger

–4–

had pulled his own pants down and requested that appellant "suck his dick." Gyger talked appellant into coming back in the apartment.

Appellant told the detectives that he walked into Seghetti's bathroom and got the gun because Gyger kept "bickering and saying stuff." Appellant said he considered shooting himself but "for some reason" pointed the gun at Gyger instead. Appellant also told the detectives he intended to shoot himself after shooting Gyger but then his dog grabbed his arm, kept him from doing it, and thereafter led him to Gyger's Cadillac.

Because the police officers processing the scene at Gyger's apartment had not yet located the gun, appellant told the detectives where to find it, *i.e.*, on the floor of a linen closet in Seghetti's bathroom where Seghetti stored it. According to appellant, Gyger had previously shown appellant where Seghetti's gun was kept after "the other men" in Natalee's life had threatened both appellant and Gyger. Appellant told the detective that he had previously "played" with the gun.

Appellant maintained throughout the interview that he did not know the gun was loaded. Contrary to that statement, appellant also told the detectives he found the pistol in a holster within a case, grabbed a "clip of bullets" from the case, and put the clip in the pistol. When asked if he chambered a round, appellant said he did but he "did it twice" to "pull the round out," and mimed pulling back the slide of a semi-automatic pistol. He said that after he had pulled the slide back twice, he "forgot to pull it again" and thought it was "empty." He also claimed that he took the clip back out of the pistol after pulling the slide back twice, and put it back in the case before putting the gun to Gyger's head. Appellant acknowledged that, though he had never owned a gun, he was familiar with guns and had shot all kinds of guns in the past.

Appellant was subsequently charged with Gyger's murder and indicted under two alternative theories:

That JACOB NATHAN ROSS, hereinafter called Defendant, on or about the 21st day of January, 2016 in the County of Dallas, State of Texas, did unlawfully then and there intentionally and knowingly cause the death of WILLIAM MICHAEL GYGER, an individual, hereinafter called deceased, by SHOOTING DECEASED WITH A FIREARM, a deadly weapon,

And further did unlawfully then and there intend to cause serious bodily injury to WILLIAM MICHAEL GYGER, hereinafter called deceased, and did then and there commit an act clearly dangerous to human life, to-wit: by SHOOTING DECEASED WITH A FIREARM, a deadly weapon, and did thereby cause the death of WILLIAM MICHAEL GYGER, an individual.

*See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

At trial, appellant's identity as the shooter was uncontested. To establish appellant's guilt, the State relied on 1) appellant's statements to the police and the detectives, 2) surveillance footage showing him leaving Gyger's apartment, 3) evidence of gunshot residue on his hands, and 4) the results of DNA testing performed on the gun, which revealed a mixture of DNA to which appellant was the primary contributor.

Appellant called no witnesses at the guilt/innocence phase and presented no defense to his act of shooting Gyger.[2] Rather, the primary issue centered on appellant's mental state when he pointed the gun at Gyger and pulled the trigger. Appellant argued that he lacked the intent or knowledge necessary to commit murder and that, "at worst," his act of pulling the trigger was merely negligent. According to the defense, Gyger and appellant had a symbiotic relationship and the financial support Gyger provided appellant meant that appellant could not have intended to kill Gyger. Appellant's attorney told the jury it would have to make a credibility determination about appellant's statement to the police and attributed the inconsistencies in those statements to the detectives' objectives in questioning appellant. It was argued that appellant's assertion during his

---

[2] Defense counsel did highlight a bruise on Gyger's lip, which the medical examiner conceded could be evidence of an altercation, and markings on Gyger's knuckles, which a crime scene investigator interpreted as postmortem lividity.

interview that he thought the gun was not loaded was credible, thus making the shooting "a terrible accident" and warranting a conviction for criminally negligent homicide as opposed to murder.

The State's theory at trial, however, was that Gyger's death was an "intentional, cold-blooded killing."

The State offered evidence showing that appellant had to know that the gun was loaded. Tony Seghetti, Gyger's roommate and the owner of the murder weapon, testified that he never kept a loaded gun. Seghetti testified that he had attended "a lot of gun safety courses" and knew how to store a gun: "in the case, clip out." It was Seghetti's habit to clean the gun personally after firing it at the gun range, ensure the chamber was clear, and secure it with "ambidextrous safeties" which had to be released to fire it. Additionally, Seghetti stored the gun in a "military style" holster that prevented the slide from cocking back and chambering a round while the gun was holstered. He stored the holstered gun in a gun case, with the magazine stored separately within the case. Seghetti kept the gun case in a "range bag," along with boxes of ammunition and his protective equipment which were hidden in the bottom of his linen closet.

In addition to the various motives detailed in appellant's statements to detectives, Seghetti's testimony introduced another possible motive for the murder: that appellant was about to be evicted from the apartment. Seghetti testified that he and Gyger were old friends who generally stayed out of each other's personal business and did not question each other's choice of guests. However, in the days before the shooting, Seghetti noticed that appellant and his dog were spending an inordinate amount of time at the apartment. Seghetti testified that he talked to Gyger about this situation and demanded that it be rectified: the apartment was starting to "smell like dog," and, having not paid a pet deposit, they were violating their lease. Seghetti told Gyger that they had to "get [appellant] and the dog out of here." Gyger agreed to ask appellant to leave by the following Monday. Monday came and went, but appellant and the dog were still in the apartment.

Seghetti confronted Gyger on Tuesday morning, and gave him the day to show appellant the door. Appellant shot Gyger either Wednesday night or in the early morning hours of Thursday.[3]

Natalee also testified that she told the police that she thought appellant was using Gyger for money. She believed they might be exchanging sex for money. In a Facebook posting, Natalee wrote that Gyger had paid appellant $500 for a specific sexual act. She agreed that it would be fair to say that appellant was getting the money he wanted and Gyger was getting the sex he wanted.

The jury convicted appellant of an intentional and knowing murder. Following a punishment hearing, the jury rejected appellant's defense of sudden passion and sentenced him to forty-five years' imprisonment.

## Sufficiency of the Evidence

In his first issue, appellant claims that the evidence is insufficient to support his conviction for murder because the evidence reflects only negligence as opposed to intent, knowledge or recklessness. Appellant does not dispute that he shot and killed Gyger; his only challenge is to the culpable mental state with which he acted.[4] The State responds that the evidence is sufficient for the jury to have found either that appellant acted with intent or knowledge or that appellant knew Gyger's death was a reasonably certain result of his conduct. We agree with the State.

### Standard of Review

A challenge to the sufficiency of the evidence is evaluated under the standards established in *Jackson v. Virginia* 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and

---

[3] Seghetti spent the night of the murder at his girlfriend's residence. He learned of Gyger's death the following morning. It was only after Gyger's death that Seghetti learned Gyger was living a gay lifestyle.

[4] While appellant made some statements to the Carrollton detectives which could indicate an accidental shooting, appellant did not request a charge on voluntariness-of-conduct, nor does he raise an issue on appeal that the shooting was not a voluntary act. TEX. PENAL CODE ANN. § 6.01(a).

determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001). Indeed, circumstantial evidence is considered as probative as direct evidence and is sufficient, standing alone, to establish a defendant's guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

We defer to the trier of fact's resolution of any conflicting inferences that are raised in the evidence and presume that the trier of fact, in this case the jury, resolved such conflicts in favor of the prosecution. *Jackson*, 443 U.S. at 318; *Brooks*, 323 S.W.3d at 894; *Sennett v. State*, 406 S.W.3d 661, 666 (Tex. App.—Eastland 2013, no pet.). We will uphold the verdict unless a rational fact finder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899. The State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

A culpable mental state must generally be inferred from the circumstances surrounding the crime. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018). A reviewing court cannot read a defendant's mind and, absent a confession, we must infer his mental state from his "acts, words and conduct." *Id*. The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, implausible explanations to the police, and the extent of the victim's injuries. *Id*.

### The Jury Charge

The jury charge authorized a conviction for murder on either theory alleged in the indictment:

> Now, if you find from the evidence beyond a reasonable doubt that on or about January 21st, 2016, in Dallas County, Texas, the defendant Jacob Nathan Ross, did unlawfully then and there intentionally or knowingly cause the death of William Michael Gyger, an individual, by shooting him with a firearm, a deadly weapon, then you will find the Defendant guilty of murder.
>
> OR
>
> If you find from the evidence beyond a reasonable doubt that on or about January 21st, 2016, in Dallas County, Texas, the defendant Jacob Nathan Ross, did unlawfully then and there intend to cause serious bodily injury to William Michael Gyger, an individual, and did then and there commit an act clearly dangerous to human life, to-wit: by shooting William Michael Gyger with a firearm, a deadly weapon, and did thereby cause the death of William Michael Gyger, then you will find the Defendant guilty of murder.

Where, as here, the trial court's charge authorizes the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara*, 152 S.W.3d at 49.

The jury was also charged that, if they found that appellant was not guilty of murder, they could consider the lesser included offenses of manslaughter or criminally negligent homicide:

> Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about the 21st day of January, 2016, in Dallas County, Texas, the Defendant, Jacob Nathan Ross, did recklessly cause the death of William Michael Gyger, by shooting William Michael Gyger with a firearm, a deadly weapon, then you will find the defendant guilty of the offense of manslaughter.
>
> If you do not so believe, or if you have a reasonable doubt, or if you cannot unanimously agree, then you will next consider whether the defendant is guilty of the lesser included offense of criminally negligent homicide.
>
> \*
>
> Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about the 21st day of January, 2016, in Dallas County, Texas, the Defendant, Jacob Nathan Ross, with criminal negligence did cause the death of

–10–

William Michael Gyger, by shooting William Michael Gyger with a firearm, a deadly weapon, then you will find the defendant guilty of the offense of criminally negligent homicide.

Unless you find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict "Not Guilty."

The jury was further charged on the proper statutory definitions of intent, knowledge, recklessness and criminal negligence:

A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly, or is reckless, with respect to the circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint.

A person acts with criminal negligence or is criminally negligent, with respect to the circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*See* PENAL § 6.03.

*Analysis*

In his brief to this Court, appellant avers that the shooting was preceded by a drunken argument with Gyger during which appellant told Gyger he was leaving the apartment and Gyger begged him to stay. When Appellant continued his preparations to leave, Gyger said "you might as well just shoot me" or words to that effect. Appellant knew where Seghetti hid his gun; he retrieved the gun, which he believed to be unloaded, pointed it at Gyger's head, and pulled the

trigger. Appellant avers in his brief that, while he was "extremely negligent" for not checking the gun to see if it was loaded, he acted neither intentionally, knowingly, or recklessly.

Based on the evidence in this case, viewed in the light most favorable to the verdict, we conclude it was reasonable for the jury to find beyond a reasonable doubt that appellant shot Gyger intentionally or knowingly.

*Appellant's Statements to the Police*

Appellant was interviewed multiple times by the police and there were many inconsistencies in his statements, all of which the jury could have resolved against appellant.

The one consistency throughout appellant's police interviews was appellant's confession that he shot and killed Gyger. Specifically, appellant told the police that he 1) retrieved Seghetti's gun, 2) held the gun to Gyger's head, and 3) pulled the trigger. Appellant admitted all three of those actions and did not deny that he was responsible for shooting and killing Gyger. While appellant claimed that he thought the gun was unloaded, the jury could have discounted those statements made during his police interviews in favor of the statements he also made that he loaded the gun before the shooting.

Additionally, appellant's statements to the police, rather than excusing his actions, also provided motive, which is a significant circumstance indicating guilt. *Guevara,* 152 S.W.3d at 50. Appellant told officers at various times that Gyger tried to rape[5] him, that Gyger was sexually aggressive, and that Gyger made repeated, unwanted sexual advances which appellant spurned. Appellant told the police that he was not gay, that Gyger would "not stop trying to do stuff," "it was just fucking weird," and he "just couldn't take it no more."

_____

[5] Appellant did not claim self-defense at trial.

Additionally, Seghetti testified he told Gyger that appellant and his dog needed to move out. A rational juror could infer that Gyger had told appellant he needed to leave. As the prosecutor argued to the jury, this would have meant that appellant's "gravy train was about to stop," providing yet another motive for the shooting.

Even the defense theory that Gyger had asked appellant to shoot him if they were not going to engage in sexual activities supports an inference that a rational jury could have drawn that appellant intended to shoot Gyger with a loaded gun.

### *Use of a Deadly Weapon*

A firearm is a deadly weapon per se. PENAL § 1.07(a)(17). Use of a deadly weapon raises an inference of intent. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (specific intent to kill may be inferred from use of deadly weapon). Because the weapon appellant used to kill Gyger is a deadly weapon per se, it can be inferred that he had the intent to cause Gyger's death. *Id*.

The distance from which the gun was fired – one to three feet, according to the medical examiner – also supports an inference of a specific intent to kill. *Ervin v. State*, 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding that when a person discharges a firearm at close range and death results, the law presumes it was his intent to kill). The location of the wound – a gaping gunshot wound to the right side of Gyger's head – would also support an inference of a specific intent to kill. *See Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974) (noting that a defendant's intent may be ascertained or inferred from the means used and the wounds inflicted).

### *Flight*

The evidence is undisputed that, after shooting Gyger, appellant fled the scene. Appellant did not call the police or an ambulance for Gyger.

Surveillance cameras at the apartment complex recorded that appellant left the apartment between 12:45 a.m. and 1:04 a.m. He had bags, clothing, and his dog with him. Appellant told the police that he left the apartment and drove Gyger's Cadillac to Argyle, Texas, to see Natalee. He told Natalee, as well as the men with her, that he had shot Gyger. When appellant noticed Kyle calling the police, he drove away. He was stopped traveling at a high rate of speed. In an interview with Carrollton detectives, appellant stated that he was planning on driving to Chicago even though he had spoken by telephone with his father who had urged him to call the police.[6]

Flight reflects consciousness of guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (noting that a "fact finder may draw an inference of guilt from the circumstance of flight"); *see also Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd) (referencing flight from the scene of a crime as evidence a jury could consider in rejecting a self-defense claim). Flight is also a circumstance from which an intent to kill can be inferred. *See Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (a finding of intent to kill may be inferred from evidence of flight from the scene).

*Concealment and Attempted Destruction of Evidence*

A jury may consider a defendant's attempt to destroy or conceal evidence as evidence of the culpable mental state for murder. *See Nisbett*, 552 S.W.3d at 267 (concealing the body).

Appellant was able to tell the police exactly where the gun was located and described in great detail how the gun was stored. The police found Seghetti's gun exactly where appellant said it would be: at the bottom of a linen closet in the bathroom of Gyger's apartment, unloaded, closed

---

[6] Appellant also told the police that when he talked with his father he was told to get out of the apartment.

up and in its case. The fact that appellant took the time to store the gun reflects that appellant did not flee the scene in a panic, but spent time concealing the murder weapon.

After his arrest, when his hands had been bagged to preserve evidence, appellant set the bags on fire. While gunshot residue was found on appellant's left hand, the fire could have destroyed other gunshot residue.

*Conclusion*

We presume that the jury, as the fact finder, resolved the conflicts in the evidence, particularly in appellant's statements to the police, in favor of the prosecution and defer to that determination. After reviewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to prove that appellant either intentionally or knowingly murdered Gyger or that he committed an act clearly dangerous to human life by shooting Gyger with a gun. We overrule appellant's first issue.

**Unanimous Verdict on Sudden Passion**

Appellant claims that the jury charge at the punishment phase authorized a non-unanimous verdict which resulted in egregious error. Specifically, appellant claims that the jury charge regarding sudden passion did not explicitly instruct the jury that it must unanimously agree that the defendant either did or did not act with sudden passion when he shot Gyger. The State responds that the jury charge required unanimity and, even if it did not, egregious harm is not shown.

Appellant did not object to the charge on the basis he now urges on appeal. Consequently, appellant must first establish that there is error in the charge and second, if error is present, that he suffered egregious harm as a result of that error. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985).

At the punishment stage of a murder trial, the defendant may raise the issue as to whether he caused the death "under the immediate influence of sudden passion arising from an adequate

cause." PENAL § 19.02(d) (stating that if the defendant proves the sudden passion issue in the affirmative by a preponderance of the evidence, the offense is a second degree felony); *Beltran v. State*, 472 S.W.3d 283, 289 (Tex. Crim. App. 2015); *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013). The jury's finding on a sudden passion special issue must be unanimous, *i.e.*, the jurors must agree that the defendant either did or did not act under the immediate influence of sudden passion arising from an adequate cause. *Sanchez v. State*, 23 S.W.3d 30, 33-4 (Tex. Crim. App. 2000); *London v. State*, 325 S.W.3d 197, 208 (Tex. App.—Dallas 2008, pet. ref'd); TEX. CODE CRIM. PROC. ANN. art 37.07 §3(c).

The trial court's punishment charge instructed the jury, in part, as follows:

Now, bearing in mind the forgoing instructions, if you believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, that he caused the death of William Michael Gyger under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue.

If you do not believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, cause the death of William Michael Gyger under the immediate influence of sudden passion arising from an adequate cause, you must make a negative finding as to the negative as to the special issue.

The Jury will answer either, "We do" or "We do not." You are instructed to answer the special issue before considering what punishment is appropriate for the Defendant.

In its concluding instructions, the trial court charged the jury that its verdict must be unanimous: "Your verdict must be unanimous and shall be arrived at by due deliberation and not by majority vote or by any method of chance."

As part of the charge, the jury was provided with the following verdict forms:

Verdict Forms (Choose One)

We, the jury, having found the defendant, Jacob Nathan Ross, guilty of murder, as charged in the indictment, and having found by a preponderance of the evidence that the defendant did not act with sudden passion by answering the

–16–

Special Issue "We Do Not", assess   his  punishment  at  confinement  in  the Institutional Division of the Texas Department of Criminal  Justice for _____ (Life, or any term of years of not less than 5 or more than 99) and assess _____ (no fine or up to $10,000).

OR

We, the jury, having found the defendant, Jacob Ross, guilty of murder, as charged in the indictment, and having found by a preponderance of the evidence that the defendant did act with sudden passion by answering the Special Issue "We Do", and assess his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for _____ (any term of years of not less than 2 or more than 20) and assess _____ (no fine or up to $10,000).

The jury selected the first form, thereby making a negative finding on the special issue of sudden passion.

This Court has held that it is not error for a court to wait until the end of a jury charge to inform the jury that its entire verdict must be unanimous; it is not necessary for the trial court to also specifically recite that the verdict on the issue of sudden passion must be unanimous. *See Fino v. State*, 05-17-00169-CR, 2018 WL 3829781, at *3 (Tex. App.—Dallas Aug. 13, 2018, pet. ref'd) (mem. op., not designated for publication); *Campa v. State*, No. 05–07–01210–CR, 2009 WL 1887123, *8 (Tex. App.—Dallas July 2, 2009, pet. ref'd) (mem. op., not designated for publication). Other courts of appeal have reached similar conclusions. *See Barfield v. State*, 202 S.W.3d 912, 918 (Tex. App.—Texarkana, 2006, pet. ref d); *Cartier v. State*, 58 S.W.3d 756, 760 (Tex. App.—Amarillo 2001, pet. ref'd); *Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922, at *14 (Tex. App.—El Paso Oct. 21, 2015, no pet.) (not designated for publication); *Latham v. State*, No. 12-05-00146-CR, 2006 WL 2065334, at *8 (Tex. App.—Tyler July 26, 2006, no pet.) (mem. op., not designated for publication).

We conclude that the trial court's jury charge was not erroneous. Because the charge was not erroneous, no harm is attendant in the verdict. We overrule appellant's second issue.

## Sudden Passion

In his third and fourth issues appellant challenges the legal and factual sufficiency of the evidence to support the jury's negative finding on the sudden passion special issue. The State responds that appellant's legal sufficiency argument fails because the jury had at least a scintilla of evidence from which it could conclude that appellant did not shoot Gyger under the immediate influence of sudden passion. The State further responds that appellant's factual sufficiency argument also fails because the jury's verdict is not so against the great weight of the evidence as to be manifestly unjust.

### *The Law of Sudden Passion*

A defendant found guilty of murder may raise, at the punishment phase of the trial, the issue of whether he caused the death of the complainant under the immediate influence of sudden passion arising from an adequate cause. PENAL § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the available range of punishment is reduced from that of a first degree felony to that of a second degree felony.[7] *Id.* A defendant acts with sudden passion if he acts with "passion directly caused by and arising out of provocation by the individual killed." *Id.* § 19.02(a)(2). The passion must arise at the time of the offense and not be solely the result of former provocation. *Id.* "Adequate cause" is defined to mean cause that would

---

[7] The punishment range for a first degree felony is imprisonment for life or for a term of not more than 99 years or less than 5 years with an optional fine not to exceed $10,000.00, while the punishment range for a second degree felony is imprisonment for a term of not more than twenty years or less than two years with an optional fine not to exceed $10,000.00. PENAL §§ 12.32, 12.33.

"commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

To be entitled to an affirmative finding on sudden passion, a defendant must demonstrate that "there was an adequate provocation, that a passion or an emotion such as fear, terror, anger, rage, or resentment existed, the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide." *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005); *Cornett v. State*, 405 S.W.3d 752, 757 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). Neither ordinary anger nor fear alone raises an issue of sudden passion arising from adequate cause. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Naasz v. State,* 974 S.W.2d 418, 425 (Tex. App.—Dallas 1998, pet. ref'd) (holding that a defendant's testimony of being upset and angry over the culmination of events that had been ongoing for some time did not rise to level of adequate cause). Nor may sudden passion be the result of former provocation; the passion must arise at the time of the offense. *Moncivais*, 425 S.W.3d at 407.

### Jury Charge

The jury was charged at the punishment phase of the trial with a special issue on sudden passion:

Special Issue

Additionally, you must determine by a preponderance of the evidence whether or not the defendant caused the death of William Michael Gyger under the immediate influence of sudden passion arising from an adequate cause.

"Adequate cause" means a cause that would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"Sudden passion" means passion directly caused by and arising out of provocation by the individual killed, or another acting with the individual killed, which passion arises at the time of the offense and is not solely the result of former provocation.

The burden of proof is by a preponderance of the evidence, and that burden rests on the defendant. The term "preponderance of the evidence" means the greater weight of the credible evidence.

Now, bearing in mind the forgoing instructions, if you believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, that he caused the death of William Michael Gyger under the immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue.

If you do not believe the defendant proved by a preponderance of the evidence that the defendant, having committed the offense of murder, cause the death of William Michael Gyger under the immediate influence of sudden passion arising from an adequate cause, you must make a negative finding as to the negative as to the special issue.

The Jury will answer either, "We do" or "We do not." You are instructed to answer the special issue before considering what punishment is appropriate for the Defendant.

The jury answered this special issue "We do not" and assessed punishment at forty-five years' imprisonment.

The issue of sudden passion, although a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 667 & n. 14 (Tex. Crim. App. 2013); *Gaona v. State*, 498 S.W.3d 706, 710–11 (Tex. App.—Dallas 2016, pet. ref'd). A finding on sudden passion may be evaluated for both legal and factual sufficiency. *Gaona,* 498 S.W.3d at 710–11.

When reviewing a legal sufficiency challenge to a negative finding on a sudden passion special issue, this Court must first review the record for a scintilla of evidence to support the jury's negative finding on sudden passion and disregard all evidence to the contrary unless a reasonable fact finder could not. *Id.* at 711. If we find no evidence that supports the jury's finding, we must

determine whether the contrary proposition was established as a matter of law. *Id*. We defer to the fact finder's determination of the credibility of the testimony and weight to give the evidence. *Id*.

When reviewing a factual sufficiency challenge to the jury's negative finding on a sudden passion special issue, this Court considers all the evidence in a neutral light, bearing in mind that the jury, as the trier of fact, assesses the weight of the evidence and the credibility of the witnesses' testimony. *Matlock*, 392 S.W.3d at 671; *see also Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). We will sustain a defendant's factual sufficiency claim only if the verdict is so against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 671; *see also Ruiz v. State*, 05-17-00669-CR, 2018 WL 6261502, at *4 (Tex. App.—Dallas Nov. 30, 2018, no pet.). We may not, however, intrude on the fact finder's role as the sole judge of the weight and credibility of the witnesses' testimony. *See Matlock*, 392 S.W.3d at 671; *Ojukwu v. State*, 05-07-01436-CR, 2008 WL 3307111, at *3 (Tex. App.—Dallas July 31, 2008, pet. ref'd) (mem. op. not designated for publication).

*Punishment Evidence and Arguments of Counsel*

At punishment, the State offered evidence of three prior bad acts committed by appellant. Appellant was arrested by a Carrollton police officer in 2010 for assaulting his mother's boyfriend. In 2015, he broke a beer bottle over Dakota Owens' head because Owens had hugged Natalee, his ex-fiancé. Natalee witnessed this attack and testified to it, as did Owens. Natalee also testified that appellant was violent to her and she believed him to be a violent person.[8]

Appellant's evidence at the punishment phase consisted of the testimony of his father, James Ross. Ross confirmed that appellant also had an arrest from 2009 for an assault on his sister.

---

[8] Natalee testified as to appellant's violent acts against her as follows: "He used to choke me and punch me in the face. He broke my jaw and I had stitches from him. He would throw me down the stairs, throw me outside, push me up against the wall. He punched me in the face several times."

Ross testified that he met Gyger and Seghetti several years before the murder when they were living in the same apartment complex. Ross and appellant would socialize with Gyger and Seghetti and Ross allowed appellant, who was a minor at the time, to sample alcoholic beverages in their company. At some point when appellant was having difficulty, as he did throughout his youth and young adulthood, Gyger offered to help Ross out with appellant, to mentor him, and "get him to be a little bit smarter."

Ross testified that at some point he had seen a text on appellant's phone from Gyger which concerned him. The two men spoke and Gyger "pooh-poohed" any love talk between himself and appellant with Gyger telling Ross "I'm just trying to help Jake." Several years later Ross had another discussion with Gyger about appellant when he saw pictures of appellant on Gyger's phone:

> I wanted to see his phone. He refused to show it to me. I got really angry with him. I started yelling at him. At that particular time, I told him I didn't ever want him coming around my family again. I didn't want to have anything to do with him anymore, and that I thought he was disgusting.

Ross soon moved from the apartment complex and told appellant not to have anything to do with Gyger again.

Ross received several telephone calls from appellant, usually late at night, while appellant was in jail. According to Ross, appellant was frustrated by his incarceration. He admitted that in one such call appellant told him that he might take the stand and "make some bullshit up."[9]

Ross also testified that appellant was not a bad person but needed more help than incarceration would provide if he was to have a future as a productive citizen.

Appellant did not testify at the punishment phase.

---

[9] The content of this telephone call was admitted as an exhibit at trial.

In jury arguments, the State argued that sudden passion was not applicable under the facts of the case as appellant's act of shooting Gyger was a "cold-blooded murder:"

> [R]emember what he did. He went to the closet. He opened a bag. He removed the gun from a holster. He put a clip in the gun. He slid the rack. He prepared himself for the murder. There's no evidence of immediate influence going on here. So he negates his own plea for mercy in his own statement.

> Adequate cause is something that a person of ordinary temper, they would be rendered incapable of cool reflection, unable to comprehend the consequences of one's act. We don't have any evidence of that here at all. And remember, it's the person of ordinary temper.

Defense counsel did not argue sudden passion. Indeed, defense counsel only mentioned appellant's relationship with Gyger in passing: "This relationship was a disaster from the beginning. And in the end it ended in a disaster." The defense argument focused on testimony from appellant's father that appellant could be a contributing member of society if given a chance. Basically, the defense's argument was a plea for leniency that never referred to any evidence which might have supported a sudden passion finding.

In responding to defense counsel's argument, the prosecutor said "I believe the Defense has conceded that this is not a sudden passion situation."

### Legal Sufficiency to Reject Sudden Passion

In his brief to this Court, appellant claims that there are three pieces of evidence which establish sudden passion: 1) his statements to the police, 2) his handling of the gun after the shooting, and 3) his statement to third parties immediately after the shooting. Appellant also claims that adequate cause was provided by Gyger whose "unwanted homosexual advances" caused appellant to "snap."

*Statements to the Police*

Appellant claims that his statements to the police establish sudden passion because those statements demonstrate that when appellant tried to leave Gyger's apartment Gyger became

"sexually aggressive" which was "his usual practice." Indeed, appellant told one arresting officer that Gyger tried to rape him. Appellant claims in his brief that he "acted with rage" because Gyger wouldn't leave him alone and that there is "no evidence to the contrary."

These statements, even if believed, do not establish sudden passion. While appellant denied being gay to the police, there was other evidence, particularly from Natalee, which would have allowed the jury to conclude that appellant and Gyger had a long standing physical relationship and had been exchanging sex for money. As Natalee testified, appellant was getting the money he wanted and Gyger was getting the sex he wanted. The jury was entitled to believe that appellant had not been truthful about his relationship with Gyger in his police interviews

Appellant also claims that he was upset about Gyger's repeated sexual advances. As he told the police, Gyger would "not stop trying to do stuff," "it was just fucking weird," and he "just couldn't take it no more." The jury could have concluded that, if anything, these statements reflect nothing more than former provocation which does not justify a finding of sudden passion.

Additionally, appellant's statements to the police reveal that appellant was angry because he blamed Gyger for his recent breakup with Natalee. Gyger had been saying things to disparage Natalee including calling her a "whore." These statements, even if made by Gyger, would not support a finding of sudden passion because Gyger's statements do not rise to the level of adequate cause. *See Mallard v. State*, No. 05-05-00434-CR, 2006 WL 2408490, at *6–7 (Tex. App.—Dallas Aug. 22, 2006, pet. ref'd) (mem. op., not designated for publication) (holding that there was inadequate cause to support a jury instruction on sudden passion where the victim called the defendant's wife a "bitch" and a "shyster ass ho"). Other evidence also showed that Gyger may have been in the process of evicting appellant from his apartment. The jury could well have believed that appellant was angry because he was losing a place to stay with his dog.

*Handling of the Gun After the Shooting*

After the shooting, appellant put the gun back in its usual hiding place. When asked during one of his interviews where the gun was, appellant told the police exactly where to find the gun. While this evidence could persuade the jury that appellant was not trying to hide the murder weapon, there is nothing in this evidence from which the jury could have concluded that appellant acted in sudden passion when he shot Gyger. This evidence could equally have persuaded the jury that appellant was attempting to hide the murder weapon hoping that if he stored the gun as it had been before the shooting his use of the gun might not be discovered until he had time to flee.

*Statement to Third Parties After the Shooting*

Appellant emphasizes three sets of statements he made which he claims shows that he acted in sudden passion.

In his statements to the police, appellant claimed that he called his father after the shooting. In one version, his father told appellant to get out of the apartment while in another version his father told him to call the police. Appellant insinuates in his brief to the Court that he called his father because he had acted in a rage and was "at a loss" as to how to proceed.

Appellant points to evidence which shows that when left the apartment, taking his clothes[10] and his dog with him in Gyger's Cadillac, he went to the Clontz residence in Argyle, Texas, where he "confessed" to Natalee and her companions that he had shot Gyger and taken his car. Appellant drove off when he saw Kyle calling the police.

---

[10] Appellant gave inconsistent statements to the police regarding his packing to leave the apartment. In one interview he told the police that his bags were already packed when he quarreled with Gyger. In another, he says that he packed after the shooting.

Appellant also emphasizes that when he was stopped by the police he "confessed" at the side of the road and later cooperated with the police by admitting his conduct, explaining his state of mind, and providing a "large amount of background contextual evidence."

Appellant fails to explain in his brief to this Court how any of this evidence establishes that he acted in the heat of sudden passion when he shot Gyger. To the contrary, in evaluating this evidence the jury could have concluded that appellant called his father to inform him that he was fleeing and/or seeking advise on how to flee the scene, that appellant contacted Natalee in an effort to obtain her help with that flight, and that his statements to the police and his conduct accompanying those statements were made in an effort to minimize his culpability and establish the foundation for a future defense at trial.

*Adequate Cause: Unwanted Sexual Advances*

There was no evidence, other than appellant's self-serving statements to the police, that Gyger was actually trying to have unwanted sexual contact with appellant at the time of shooting. Both the crime scene photos of Gyger's body and testimony from the responding officers reflect that Gyger was sitting on the couch with a bottle of alcohol in his lap and the remote control at his side; he looked "relaxed" to one officer. There was no physical evidence of a struggle apart from the shooting. The jury could reasonably conclude that Gyger did not pose any immediate threat to appellant at the time appellant shot him because he was obviously not, as the State so colorfully asserts in its brief to this Court, "chasing [a]ppellant around the apartment with his pants down."

Appellant, in his statements to the police, consistently stated that he retrieved Seghetti's gun, held the gun to Gyger's head, and pulled the trigger. The act of stopping to retrieve the gun, which was hidden from public view in another room from where Gyger was sitting, removes any "immediacy" from the shooting. *See McKinney*, 179 S.W.3d at 569-70 (holding evidence that defendant went home, sat at his desk for some time, and then retrieved his gun in preparation for

a fight showed deliberation and not sudden passion). The plain language of the statute mandates that the influence of the passion must be immediate, and the passion itself cannot be solely the result of former provocation. PENAL § 19.02(a)(2), (d). From appellant's statements to the police the jury could reasonably conclude that appellant's anger at Gyger, if any, arose either from former provocation or after a period of time for reflection.

There is more than a scintilla of evidence to support the jury's negative finding on the sudden passion special issue. We overrule appellant's third issue.

### Factual Sufficiency to Reject Sudden Passion

Appellant argues in his brief to this Court that the shooting was the "culmination of conduct that had been started by Gyger preying on [a]ppellant and resulting in [a]ppellant acting in sudden passion arising from Gyger's never ending insistence that [a]ppellant perform homosexual acts upon him." Appellant claims that the jury's negative finding on sudden passion is so against the weight of the evidence as to be "obviously wrong."

As noted above, when this Court reviews an issue on which a defendant has the burden of proof by a preponderance of the evidence, we consider all the evidence neutrally to determine if the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Moncivais*, 425 S.W.3d at 408. We may not, however, intrude on the fact finder's role as the sole judge of the weight and credibility of the witnesses' testimony. *Id*. at 409. As the sole judge of the weight and credibility of any witnesses' testimony, the jury was entitled to believe or disbelieve any witness.

From the evidence presented at trial, the jury could have reasonably believed that appellant was an aggressive and violent individual. Given the many inconsistencies that were in appellant's statements to the police, the jury could also have reasonably disbelieved much of appellant's version of the events that he recounted in his police interviews.

–27–

After reviewing all the evidence relevant to sudden passion in a neutral light, we cannot conclude the jury's rejection of appellant's claim of sudden passion arising from an adequate cause "is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671. We overrule appellant's fourth issue.

## Parole and Good Conduct Time

Appellant claims that the trial court's charge erroneously informed the jury about parole and good conduct time because he was precluded by statute from receiving any good conduct time credit. TEX. GOV'T CODE ANN. § 508.149 (a) (2). The State agrees that appellant is ineligible for good conduct time credit, but argues the charge was proper.

The jury charge on punishment included the following instructions:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.

It cannot be accurately predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

These instructions are mandated by statute and the trial court's jury charge tracked the language of that statute. CRIM. PROC. art. 37.07 § 4(a). While appellant does not dispute that these instructions tracked the appropriate statute, he argues that, because he is ineligible to receive good conduct time, the charge was misleading.

Both the Court of Criminal Appeals and this Court have rejected the exact arguments that appellant makes in this appeal. *See Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002); *Backusy v. State*, 05-17-01288-CR, 2018 WL 5730166, at *3 (Tex. App.—Dallas Nov. 2, 2018, pet. ref'd) (mem. op., not designated for publication); *Walker v. State*, 05-14-01229-CR, 2016 WL 259577, at *6 (Tex. App.—Dallas Jan. 21, 2016, pet. ref'd) (mem. op., not designated for publication); *Anderson v. State,* No. 05–13–00253–CR, 2013 WL 6870013, at *4 (Tex. App.— Dallas Dec. 31, 2013, no pet.) (mem. op., not designated for publication). We overrule appellant's fifth issue.

## Modification of Judgment

In its cross-point, the State asks this Court to modify the judgment to reflect a deadly weapon finding.

The indictment alleged that appellant caused the death of Gyger "by shooting deceased with a firearm, a deadly weapon." The jury found appellant guilty of murder "as charged in the indictment." Therefore, the jury made an affirmative deadly weapon finding. *See Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985); *Roots v. State*, 419 S.W.3d 719, 724 (Tex. App.— Fort Worth 2013, pet. ref'd); PENAL § 1.07(a)(17)(A) (providing that a firearm is a deadly weapon). The judgment, however, contains the entry "N/A" in the "Findings on Deadly Weapon" field.

We have the authority to modify an incorrect judgment when the evidence necessary to correct that judgment appears in the record. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas

1991, pet. ref'd). Accordingly, we sustain the State's cross-point and modify the trial court's judgment to read "Yes, a Firearm" in the "Findings on Deadly Weapon" field of the judgment.

## **Conclusion**

As modified, we affirm the trial court's judgment.

/Leslie Osborne/
LESLIE OSBORNE
JUSTICE

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

180262F.U05

–30–



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

JACOB NATHAN ROSS, Appellant

No. 05-18-00262-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1611734-V.
Opinion delivered by Justice Osborne.
Justices Myers and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows: add a deadly weapon finding.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 5th day of August, 2019.